UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

PAMELA EYE,                     )
                                )
    Plaintiff,                  )
                                )
vs.                             )   Civil Action No. CV-97-8-337-NE
                                )
PRUDENTIAL SECURITIES, INC.     )
THOMAS J. OWENS, THOMAS G.      )
STUHLSATZ,                      )
                                )
    Defendants.                 )

FILED
97 SEP 22 PM 3:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
SEP 2 2 1997

MEMORANDUM OPINION

Plaintiff, Pamela Eye, worked as a sales assistant in the same, Huntsville, Alabama office of Prudential Securities, Inc. in which her husband also was employed as an associate vice president. Both Eyes were terminated on April 17, 1995, amidst allegations that Mr. Eye mishandled client funds.  Pamela Eye alleges discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e et seq. The action presently is before the court on "Defendants' Motion to Dismiss or in the Alternative to Compel Arbitration." Upon consideration of the motion, briefs, evidentiary submissions, oral arguments, and pleadings, the court concludes the motions of defendants Thomas J. Owens and Thomas G. Stuhlsatz are due to be granted, the motion of Prudential Securities, Inc. is due to be denied, and the motion to compel arbitration should be held in abeyance, pending further development of issues discussed herein.

## I.  INDIVIDUAL LIABILITY

Defendants Owens and Stuhlsatz seek dismissal on the grounds that Title VII does not permit individual liability. The Eleventh Circuit has so ruled.

> Individual capacity suits under Title VII are ... inappropriate. The relief granted under Title VII is against the employer, not individual employees whose actions would not constitute a violation of the Act. ... We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly.

*Busby v. City of Orlando*, 931 F.2d 764, 771 (11th Cir. 1991) (citations omitted). Plaintiff does not name Owens or Stuhlsatz as agents, but instead sues Prudential Securities directly. Thus, there is no basis for suit against Owens or Stuhlsatz, and the claims against those individuals are due to be dismissed.

## II.  MOTION TO DISMISS MARITAL DISCRIMINATION CLAIMS

Defendant Prudential moves to dismiss plaintiff's complaint on the grounds that it asserts claims based solely on plaintiff's marital status, rather than membership in a protected class. *See Stroud v. Delta Air Lines, Inc.*, 544 F.2d 892, 893 (5th Cir. 1977). Plaintiff's complaint is not the model of clarity, but after oral argument the court believes plaintiff possibly can state a claim of gender discrimination. Prudential's motion to dismiss, therefore, is due to be denied. Nevertheless, the court directs plaintiff to file an amended complaint within 14 days, more definitely stating the basis for her Title VII claims.

### III. MOTION TO COMPEL ARBITRATION

When plaintiff was hired by Prudential, she signed a "Uniform Application for Securities Industry Registration or Transfer" (a so-called "U-4" agreement) containing the following agreement:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm ... that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations in Item 10 [*i.e., the securities exchanges in which plaintiff sought registration*[1]] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(Defendant's Exhibit 1 at 4.) Prudential bases its motion to compel arbitration on that language.

### A. The Federal Arbitration Act and its Purposes

The Federal Arbitration Act ("FAA") was originally enacted in 1925, and then reenacted in 1947, and codified as Title 9 of the United States Code. Its primary substantive provision provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA's purpose "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other

---

[1] Plaintiff sought registration with the American Stock Exchange, the National Association of Securities Dealers Exchange, and the New York Stock Exchange.

3

contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991)(citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-20 and n.6, 105 S. Ct. 1238, 1241-42 and n.6, 84 L. Ed. 2d 158 (1985)). The Act provides for stays of proceedings in federal district courts when an issue is referable to arbitration (9 U.S.C. § 3), and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement (9 U.S.C. § 4). Such provisions reflect a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983).

The first task of a district court asked to compel arbitration is to determine whether the parties entered a valid arbitration agreement. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353, 87 L. Ed. 2d 444 (1985). This step is required by the FAA:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4. Thus, "a court asked to compel arbitration of a dispute [must] determine whether the parties agreed to arbitrate that dispute." *Mitsubishi*, 473 U.S. at 626, 105 S. Ct. at 3353.

B.  **Arbitrability of Title VII Claims**

   1.  **Early cases prohibiting arbitration**

Despite the mandates of the FAA, courts initially were reluctant to enforce pre-dispute arbitration agreements in Title VII cases. In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974), the Supreme Court discussed prospective waivers of Title VII rights in a case involving a union member whose collective bargaining agreement provided for arbitration of discrimination claims. With regard to congressional intent and the arbitrability of Title VII claims, the Court stated: "we think it clear that there can be no prospective waiver of an employee's rights under Title VII." *Id.* at 51, 94 S. Ct. at 1021.

Most courts followed *Alexander's* broad themes when determining the enforceability of pre-dispute arbitration agreements. The Eleventh Circuit held "[t]here can be no prospective waiver of an employee's rights under Title VII, ..., because 'this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate.'" *Schwartz v. Florida Board of Regents*, 807 F.2d 901, 906 (11th Cir. 1987)(citations omitted) (quoting *Barrantine v. Arkansas-Best Freight Systems, Inc.*, 450 U.S. 728, 740, 101 S. Ct. 1437, 1445, 67 L. Ed. 2d 641 (1981).

   2.  **Arbitrability of statutory claims**

A decade after *Alexander*, however, the Supreme Court sounded a retreat from the broad statements of that case. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 61, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985), the Court said: "By agreeing to

5

arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." *Id.* at 628, 105 S. Ct. at 3354. The Court further observed: "Having made the bargain to arbitrate, the party should be held to it unless Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 628, 105 S. Ct. at 3354-55. In *Mitsubishi,* the Court was concerned with antitrust claims under the Sherman Act, but subsequently applied the same rationale to other business-related statutes. *See Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987) (RICO); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S. Ct. 1917, 104 L. Ed. 2d 526 (1989) (Securities Act of 1933).

In *Gilmer v. Interstate/Johnson Lane Corporation,*[2] the Supreme Court for the first time applied the *Mitsubishi* analysis to a federal civil rights statute. Reviewing the plaintiff's Age Discrimination in Employment Act[3] claims, the Court stated "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA." *Gilmer,* 500 U.S. at 26, 111 S. Ct. at 1652. Because ADEA claims are statutory, the Court placed the burden on the employee to "show that Congress intended to preclude the waiver of a judicial forum for ADEA claims." *Id.*

---

[2] 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991)

[3] 29 U.S.C. §§ 621 *et seq.*

6

> If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. ... Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."

*Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983)). The *Gilmer* Court enforced the arbitration agreement, because the employee failed to meet that burden. *Id.* at 35, 111 S. Ct. at 1657.

The *Gilmer* Court also distinguished *Alexander* in three ways. First, the Court noted that the discrimination claims in *Alexander* were contractually created by a labor-management collective bargaining agreement, and could not preclude subsequent enforcement of statutory rights accorded individuals. *Id.* Second, the employee in *Alexander* was represented in arbitration by his union, which might not adequately protect his individual interests. *Gilmer*, 500 U.S. at 35, 111 S. Ct. at 1657. Third, *Alexander* was not decided under the FAA and its "liberal policy favoring arbitration." *Id.*

### 3. Validity of pre-dispute arbitration agreements after *Gilmer*

Pursuant to *Gilmer*, this court must compel arbitration of plaintiff's Title VII claims unless she fulfills her burden of showing congressional intent to preclude such arbitration. The Eleventh Circuit previously stated, "it is clear that Title VII claims are subject to compulsory arbitration." *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992).

Unfortunately, the Eleventh Circuit did not conduct *Gilmer's* three-part analysis of congressional intent, without which arbitration of Title VII claims cannot be "clear." In fact, *Bender* made no mention of amendments to Title VII made by the Civil Rights Act of 1991, presumably because those amendments were not retroactive and inapplicable. *See Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (noting non-retroactivity of 1991 amendments to Title VII). Therefore, even if *Bender* had analyzed congressional intent with regard to Title VII, a second analysis would be mandated to determine if that intent changed with the 1991 amendments.

Thus, the parties are directed to submit briefs addressing congressional intent to preclude pre-dispute waivers of the right to a judicial forum under Title VII. Particularly, the parties are directed to address *Gilmer's* three indicators of intent: (1) the text of Title VII, as amended by the Civil Rights Act of 1991; (2) the legislative history of the Civil Rights Act of 1991; and (3) any "inherent conflict" between arbitration and Title VII's underlying purposes.

### a.   Plaintiff's burden

As a preliminary matter, this court notes that *Gilmer* does not specify the nature of the burden placed on the employee, and only requires that plaintiff "show" congressional intent. That "showing," however, must be sufficient to overcome the presumption in favor of arbitration. *Gilmer*, 500 U.S. at 26, 111 S. Ct. at 1652. Therefore, the parties are directed to discuss whether the

8

plaintiff merely carries a burden of production, or some greater burden.

### b. Text of Title VII

Section 118 of the Civil Rights Act of 1991 amended Title VII, and adopted the following language: "Where appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under [these laws]." Pub. L. No. 102-166, § 118, 105 Stat. 1071 (see notes following 42 U.S.C. § 2000e). The amendments also created the right to a jury trial in Title VII actions. 42 U.S.C. § 1981a(b), (c). The parties are directed to discuss how those provisions, or any other relevant provisions of Title VII, demonstrate congressional intent (or lack thereof) as to the enforceability of pre-dispute arbitration agreements.

### c. Legislative history of Title VII

In drafting the Civil Rights Act of 1991, the Education and Labor Committee for the House of Representatives submitted a report approximately three weeks before *Gilmer*, stating:

> the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.

H.R. Rep. No. 40(I)(1991), *reprinted in* 1991 U.S.C.C.A.N. 546, 635. The House Judiciary Committee issued a substantially similar report four days after *Gilmer* was decided. H.R. Rep. No. 40(II)(1991),

9

1991 WL 87020. Furthermore, the Education and Labor Committee rejected a proposal which would have permitted the use of arbitration "in place of judicial resolution," and concluded that "American workers should not be forced to choose between their jobs and their civil rights." H.R. Rep. No. 40(I)(1991), *reprinted in* 1991 U.S.C.C.A.N. 546.

When interpretive remarks on Section 118 were entered into the Congressional Record six months after *Gilmer*, the chairman of the House Committee on Education and Labor stated:

> This section contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forego statutory rights. No approval whatsoever is intended of the Supreme Court's recent decision in Gilmer v. Interstate/Johnson Lane Corp. ....

137 Cong. Rec. H9505-01, *H9530 (1991) (remarks of Rep. Edwards). The ranking Minority Member of the House Judiciary Committee, however, entered a different interpretation of Section 118:

> This provision encourages the use of alternative means of dispute resolution, including binding arbitration, where the parties knowingly and voluntarily elect to use these methods. In light of the litigation crisis facing this country and the increasing sophistication and reliability of the alternatives to litigation, there is no reason to disfavor the use of such forums. See Gilmer v. Interstate/Johnson Lane Corp. ....

137 Cong. Rec. H9505-01, * H9548 (1991) (remarks of Rep. Hyde).

The parties are directed to discuss whether the above-referenced legislative history (or any other legislative history of Title VII) demonstrates congressional intent to preclude enforcement of pre-dispute arbitration agreements.

10

d.  **Inherent Conflict**

When the Eleventh Circuit followed *Gilmer* and found "no reason to distinguish between ADEA claims and Title VII claims," it implicitly found no "inherent conflict" between arbitration and Title VII. *See Bender*, 971 F.2d at 700. The *Bender* court, however, failed to review either the impact or lack of impact of the Civil Rights Act of 1991.

That Act granted the right to a jury trial in Title VII actions. Thus, the Seventh Circuit has recognized the "paradox" created by an Act which grants a trial by jury, but at the same time allows employers to deprive employees of that new right. *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 363 (7th Cir. 1997). Even so, the right to a jury trial existed under the ADEA at the time *Gilmer* was decided. *See Lindsey v. American Cast Iron Pipe Co.*, 810 F.2d 1094, 1097 n.3 (11th Cir. 1987) (noting the ADEA was amended in 1978 to add a jury trial provision). Consequently, this court doubts the addition of that one right creates any distinction from *Gilmer* sufficient to create an "inherent conflict."

In addition to the right to a jury trial, the 1991 Act "created a new species of public rights." *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 965 F. Supp. 190, 199 (D. Mass. 1997).

> It is an open question at this point, whether arbitrators are able to vindicate these public rights — broad class-based injunctive relief, the ability to award punitive damages, to grant injunctions or declaratory judgments in situations in which individual claimants have no compensatory damages. To what extent can arbitrators mirror or at least not undermine "the important role

11

played by an independent judiciary in eradicating employment discrimination?"

*Rosenberg*, 965 F. Supp. at 200 (quoting *Gilmer*, 500 U.S. at 42, 111 S. Ct. at 1661 (Stevens, J. dissenting)). The parties are directed to discuss whether the purposes of Title VII, as amended, are compatible with the concepts of arbitration.

### 4. Adequacy of arbitral procedures

When discussing the "inherent conflict" prong of its three-part test, *Gilmer* also discussed the adequacy of the particular arbitral procedures established by the New York Stock Exchange. Thus, courts reviewing *Gilmer* have found certain procedures may be unenforceable if they inadequately protect employees' rights. *See Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 965 F. Supp. 190, 201 (D. Mass. 1997) (discussing NASD & NYSE procedures). The Eleventh Circuit, however, has demonstrated an acceptance of the particular arbitral procedures adopted by the New York Stock Exchange and the National Association of Securities Dealers, which would apply to the present case. *See Kidd v. Equitable Life Assurance Society*, 32 F.3d 516, 518 n.4 (11th Cir. 1994); *Bender*, 971 F.2d at 700. The parties, therefore, are not invited to discuss the adequacy of those procedures.

### C. Waiver Standards

#### 1. Pre-dispute waiver

If Congress did not intend to bar pre-dispute waivers of Title VII rights, a standard must be established to determine if the right to a judicial forum was properly waived. The *Alexander* Court

12

suggested the waiver of Title VII claims must be "knowing and voluntary." 415 U.S. at 52 n.15, 94 S. Ct. at 1022 n.15. Furthermore, courts interpreting waiver of the Seventh Amendment right to a jury trial have required a "knowing and voluntary" waiver. *See Leasing Serv. Corp. v. Crane*, 804 F.2d 828 (4th Cir. 1986).

Amendments to the ADEA may also be informative to this inquiry, because that statute now requires a "knowing and voluntary" standard for waiver of any rights. See 29 U.S.C. § 626(f)(1). Those amendments were part of the Older Workers Benefits Protection Act, passed prior to the Civil Rights Act of 1991. Thus, Congress demonstrated the ability to enunciate a "knowing and voluntary" standard with regard to the ADEA, but failed to specify such a standard for Title VII. The parties are thus directed to brief the issue of what standard should be applied to pre-dispute waivers of Title VII rights.

## 2. Post-dispute waiver

Even if Congress intended to prevent pre-dispute waivers of the right to a judicial forum under Title VII, there is still a possibility that plaintiff's post-dispute actions waived her rights. Plaintiff instituted arbitration with her husband against Prudential, but she asserts she only submitted her non-statutory claims to arbitration.[4] (Plaintiff's Brief at 6.) That request for arbitration may constitute a ratification of her earlier

---

[4]Prudential asserts plaintiff is estopped from arguing that her Title VII claims cannot be submitted to arbitration. The court declines to address that argument at this time.

13

execution of the arbitration agreement. The Eleventh Circuit has stated that "if the amended NASD Code applies to Appellees, their [Title VII] claims must be submitted to arbitration." *Kidd*, 32 F.3d at 518. *Kidd* makes no distinction between pre-dispute and post-dispute waivers, and seems to foreclose plaintiff's "pick and choose" philosophy on claims which can be submitted to arbitration. Thus, the parties are directed to discuss whether plaintiff's acceptance of the NASD arbitration procedures constitutes a waiver of her right to a judicial forum for her Title VII claims.

### IV.  CONCLUSION

For the foregoing reasons, the motions to dismiss of Owens and Stuhlsatz are due to be granted. The motion to dismiss of Prudential Securities, Inc. is due to be denied, but plaintiff must file an amended complaint and more definite statement within 14 days. The motion to compel arbitration will be held in abeyance, pending the procedures outlined above.

DONE this the 22nd day of September, 1997

_____
United States District Judge